[Civ. No. 15812. Fourth Dist., Div. Two. Feb. 2, 1977.]

XEROX CORPORATION, Plaintiff and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

[And five other cases.]*

---
*Xerox Corp. v. City and County of San Francisco; Xerox Corp. v. County of San Mateo; Xerox Corp. v. County of San Diego; Xerox Corp. v. County of Alameda; Xerox Corp. v. County of Sacramento.

748

**COUNSEL**

Sheppard, Mullin, Richter & Hampton, John D. Hussey and Robert Joe Hull for Plaintiff and Appellant.

O'Melveny & Myers, Bennett W. Priest and Frederick A. Richman as Amici Curiae on behalf of Plaintiff and Appellant.

Donald L. Clark, County Counsel, Jack Limber, Deputy County Counsel, Thomas M. O'Connor, City Attorney, and William Barrett, Deputy City Attorney, Keith C. Sorenson, District Attorney, Thomas F. Casey III, Deputy District Attorney, John B. Heinrich, County Counsel, Monte L. Fuller, Deputy County Counsel, Richard J. Moore, County

Counsel, James F. May, Deputy County Counsel, Adrian Kuyper, County Counsel, and Robert F. Nuttman, Assistant County Counsel, for Defendants and Respondents.

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, Edward P. Hollingshead and Derry L. Knight, Deputy Attorneys General, as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**MORRIS, J.**—This is an appeal from a judgment in favor of respondents in a coordination proceeding involving six actions for the recovery of unsecured personal property taxes alleged to have been illegally and erroneously collected by the six respondent counties.

For the fiscal year ending June 30, 1972, the assessors for the counties named in these actions assessed to appellant certain personal property manufactured and owned by appellant on the lien date, and leased to various customers in California. The appellant paid the taxes under protest and brought these actions pursuant to California Revenue and Taxation Code section 5138, alleging that the assessors had erroneously included, as an element of the "full cash value" of the property, amounts representing sales tax and freight charges. The trial court entered judgment in favor of respondents, holding that sales tax and freight charges are properly includable in arriving at full cash value. Judgment affirmed.

### The Facts

The personal property in question consisted of office copying machines and related equipment manufactured by appellant, and leased by it on the lien date to various users within the taxing jurisdictions of the respondents. The property was leased pursuant to service "agreements," the principal terms of which provided:

(1) The property remained under the ownership of appellant;

(2) Rentals for the equipment were based upon a combination of a fixed monthly charge and a use charge that varied depending on the number of copies made by the customer;

(3) Service and maintenance of the machines were provided by appellant at no additional charge to the customer;

(4) The agreement could be terminated by either party upon 15 to 30 days' notice; and

(5) The customers made no investment in the equipment and obtained no rights with respect to the equipment upon termination of the agreement.

The vast majority of appellant's equipment is marketed pursuant to the above-described lease arrangement. Although most of the models of equipment had a list price, very few copiers were actually sold. The equipment was readily replaceable by other models, and there was a history of periodic new model introduction in the industry.

The method used by the various assessors in valuing appellant's equipment varied only slightly from county to county.

For those models of equipment for which a list price was published on the lien date, the following methods were used to determine the value of new equipment:

(1) In Alameda County, the assessor used the list price for new equipment and added a factor of 6 percent, which included 5½ percent sales tax and ½ percent for freight. (The Assessment Appeals Board reduced freight charges ¼ percent, and reduced the assessment accordingly.)

(2) In Orange County, the assessor used the list price and added 5 percent for sales tax and, where applicable, the amount of placement charges charged by appellant in installation of some of its equipment.

(3) In Sacramento County, the assessor used the average of commercial and government list prices for an item of equipment and added 5 percent for sales tax and ½ percent for freight.

(4) In San Diego, the assessor used the list price and added 5 percent for sales tax.

(5) In San Mateo County, the assessor used the list price and added 5 percent for sales tax and ½ percent for freight.

(6) In San Francisco, the assessor used the list price and added ½ percent for freight charges and from 4 to 5½ percent sales tax, depending on the year of manufacture of the machine.

For those items that had no list price the assessors generally determined the value of a new piece of equipment by using a figure of 35 times the average monthly rental for that model and adding the sales tax and freight charges as stated above. The Orange County Assessor used a figure of 37 times the average monthly rental, which included a factor for sales tax and freight.

The amounts so determined were depreciated to determine the value of equipment that was one year old or older.

The propriety of the assessors' use of list price was not contested in these proceedings. The issues raised at the hearings before the Assessment Appeals Board were limited to the propriety of including an amount representing sales tax and freight charges in determining full cash value.

*The Market Value Concept and Approaches to Value*

*The Constitution of California provided on the lien dates applicable to these proceedings: "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided."* (Cal. Const., art. XIII, § 1 [as amended in 1962].)

■ The legal standard of value in California, which has been described variously as "value," "cash value," and "full cash value," was defined on the lien date in question as: ". . . the amount at which property would be taken in payment of a just debt from a solvent debtor." (Rev. & Tax. Code, § 110 [Stats. 1941, ch. 605, § 1, p. 2052].) This has been construed by the California Supreme Court to require that property be assessed at "the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. It is a measure of desirability translated into money amounts [citation], and might be called the market value of property for use in its present condition." (*De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 562 [290 P.2d 544].) ■ Thus, the standard of value for

assessment is market value. Indeed, in amending section 110 of the Revenue and Taxation Code to incorporate the *De Luz* definition of full cash value, the Legislature employed the term "fair market value" as interchangeable with "full cash value." Fair market value contemplates a hypothetical transaction between an informed seller, being under no compulsion to sell, and an informed buyer, being under no compulsion to buy. (See *Kaiser Co. v. Reid* (1947) 30 Cal.2d 610, 623 [184 P.2d 879].)

In order to insure uniformity in appraisal practices, the State Board of Equalization is charged with the duty of prescribing rules and regulations to govern assessment practices throughout the state. (Gov. Code, § 15606, subd. (c); Rev. & Tax. Code, § 401.5.) Pursuant to this authority the board has issued regulations for the guidance of local boards of equalization and assessors. These regulations are set forth in title 18 of the California Administrative Code and have incorporated the valuation approach above set forth. (Cal. Admin. Code, tit. 18, § 2.)[1]

To assist the assessor in estimating value, the regulations require that he consider the three standard appraisal approaches: namely, the comparable sales approach, the replacement or reproduction cost approach, and the income approach. (Cal. Admin. Code, tit. 18, §§ 3-8.) When appropriate to the property being appraised, these methods are valid indicators of value because they recognize those market forces that affect the price at which knowledgeable buyers and sellers would arrive in an arm's length transaction.

In the appraisal of tangible personal property for purposes of taxation, the property may be found on the lien date at various phases or levels of production or distribution. At whatever level it is found, from primary producer or manufacturer to the ultimate consumer, it is necessary that the property be assessed on the lien date to the person owning, possessing or controlling it on that date. (Rev. & Tax. Code, § 405.) It would be manifestly unfair to the taxpayer to value personal property such as livestock or petroleum in the hands of the primary producer at the price it will ultimately bring after having been processed

---

[1]Section 2, Title 18, California Administrative Code reads: "The Value Concept. In addition to the meaning ascribed to them in the Revenue and Taxation Code, the words 'full value,' 'full cash value,' 'cash value,' 'actual value,' and 'fair market value,' mean the price at which a property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would transfer for cash or its equivalent under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other."

and moved to the market place. It is equally apparent that it would be unfair to the taxing agency and to other taxpayers for the ultimate consumer, or even the retailer, to be taxed at the value of the unprocessed mineral or livestock. Under neither circumstance would the assessment represent the market value of the product at that level of its production or trade. Thus, the costs incurred in producing and marketing property are elements which in common experience ordinarily determine value. (*Michael Todd Co.* v. *County of Los Angeles* (1962) 57 Cal.2d 684, 697 [21 Cal.Rptr. 604, 371 P.2d 340].)

In an attempt to establish uniformity in the assessment of such property, the State Board of Equalization has established regulations requiring the assessor to give recognition to the "trade level" at which the property is situated on the lien date and "to the principle that property normally increases in value as it progresses through production and distribution channels." (Cal. Admin. Code, tit. 18, § 10.) Accordingly, guidelines have been established to assist the assessor in determining "value" at each trade level. These regulations generally provide for valuation of property in the hands of the primary producer at the price it will bring at the first market less the costs yet to be incurred in processing and moving the property to market, and for valuation of property in the hands of the processing manufacturer at the cost of the property, or cash price at which it is expected to sell less costs yet to be incurred, and experienced gross profits. (Cal. Admin. Code, tit. 18, § 10.)

As the property approaches the ultimate consumer, the relationship of trade level value to "market value" becomes more apparent since the property is more readily marketable. Consequently, the guidelines provide for valuation in the hands of a retail merchant at the amount for which it would transfer to other retailers of like property (the price paid on sale from wholesaler to retailer), and finally, tangible personal property in the hands of the person who holds it for consumption is to be valued in accordance with standard methods of appraisal, i.e., the comparable sales approach, the reproduction or replacement cost approach, and the income approach. (Cal. Admin. Code, tit. 18, § 10, subds. (d), (e).)

Thus the business machines owned by appellant herein, being under lease to the ultimate consumer must be valued in accordance with the standard methods of appraisal.

Nevertheless, the trade level concept is useful in assessing the leased equipment for two reasons; namely, it establishes the trade level at which the property is to be appraised, and it focuses on the elements that help establish the market price.

As pointed out by the court in *Ex-Cell-O Corp.* v. *County of Alameda* (1973) 32 Cal.App.3d 135, 141 [107 Cal.Rptr. 839], the trade level theory produces equity between taxpayers by assuring that the taxpayer consumer who owns his equipment will pay the same tax on identical equipment as the taxpayer who leases the equipment to the ultimate consumer. The market value of the equipment is the same if the property is held by the ultimate consumer regardless of who pays the tax.

Also, because the consideration of the various levels of production compels an awareness of the costs incurred at each level of production and marketing, the relationship between the costs of preparing and marketing the property and the ultimate market price becomes more apparent.

*The Assessment Procedure Used in This Case*

The appellant and respondents are in agreement that the business machines involved in this lawsuit are in the hands of the persons who hold them for consumption (the lessees) and they must therefore be assessed at the highest level of exchange. However, appellant argues that the sales tax and freight or installation charges are not a part of the value in exchange at the consumer trade level.

Appellant contends that the inclusion of the sales tax is improper on the following grounds:

(1) The sales tax that a seller may collect is not part of the "price" that the parties would agree upon in the market value approach.

(2) The sales tax and freight charges are not a part of the "cost" of the property under the cost method of valuation.

(3) The inclusion of sales tax is a distortion of the income method of valuation.

(4) The sales tax is an item in which appellant has no interest.

We will consider these arguments in order.

*1. Sales Tax a Part of Agreed Price*

In support of its contention that sales tax is not a part of the price, appellant argues that "the amount of sales tax that a seller may collect from a buyer" is not known until the price itself has been agreed upon, and therefore it is not a part of the purchase price. This argument ignores the fact that the sales tax is an excise tax imposed upon the retailer for the "privilege of selling tangible personal property at retail." (Rev. & Tax. Code, § 6051.)    ▮    The state sales tax is " 'not a tax on the sale or because of the sale but . . . an excise tax for the privilege of conducting a retail business measured by the gross receipts from sales.' " (*City of Pomona* v. *State Bd. of Equalization* (1959) 53 Cal.2d 305, 309 [1 Cal.Rptr. 489, 347 P.2d 904], citing *Livingston Rock & Gravel Co.* v. *De Salvo* (1955) 136 Cal.App.2d 156, 160 [288 P.2d 317]; see also *National Ice etc. Co.* v. *Pacific F. Exp. Co.* (1938) 11 Cal.2d 283, 289 [79 P.2d 380]; *Graham Bros., Inc.* v. *Los Angeles* (1935) 6 Cal.App.2d 203 [44 P.2d 452]; *People* v. *Herbert's of Los Angeles, Inc.* (1935) 3 Cal.App.2d 482, 483-484 [39 P.2d 829].) The law imposes a tax at a fixed rate upon the gross receipts and not on the individual sales, and the fact that the law authorizes a bookkeeping method to compute the amount of the tax separately from the sales price does not change the character of the tax. (*Roth Drug, Inc.* v. *Johnson* (1936) 13 Cal.App.2d 720, 737 [57 P.2d 1022].) Neither does the fact that the fund, out of which the retailer pays the tax, has been collected from the consumers make the tax a tax on the consumer. The retailer, though authorized to collect the tax from his consumers, is not required to do so. Therefore, "The tax being a direct obligation of the retailer and, so far as the consumer is concerned, *a part of the price paid for the goods* and nothing else, it is neither in fact nor in effect laid upon the consumer." (Italics added.) (*Western L. Co.* v. *State Bd. of Equalization* (1938) 11 Cal.2d 156, 164 [78 P.2d 731, 117 A.L.R. 838].)

Appellant contends that this rule, which has been consistently followed in California since the original enactment of the sales tax in 1933, has now been overturned by the United States Supreme Court in *Diamond National Corp.* v. *State Board* (1976) 425 U.S. 268 [47 L.Ed.2d 780, 96 S.Ct. 1530]. The decision in the *Diamond National* case is indeed contrary to the holding of the California Supreme Court in the *Western Lithograph* case. Both cases involved the imposition of the California sales tax on the sale of personal property to a national bank. In *Western Lithograph* the California Supreme Court affirmed the denial of a refund to the plaintiff-vendor of the taxes measured by sales made to a national

bank on the ground that the incidence of the tax was on the retailer, not on the consumer.

In the *Diamond National* case, the United States Supreme Court, in a one paragraph per curiam opinion, stated, "We are not bound by the California court's contrary conclusion, and hold that the incidence of the state and local sales taxes falls upon the national bank as purchaser and not upon the vendors. The national bank is therefore exempt from the taxes under former 12 U.S.C. § 548 [12 U.S.C.S. § 548] [prior to amendment in 1969]. . . ."[2]

However, the fact that the United States Supreme Court did not consider itself bound by the long line of California decisions in determining the incidence of the tax in a case involving a federal claim of immunity, does not affect the state court's interpretation insofar as it defines the legal incidence of the tax independently of a claim of federal immunity. (*Diamond National Corp.* v. *State Board, supra,* 425 U.S. 268 [47 L.Ed.2d 780, 96 S.Ct. 1530] (see dis. opn. of Mr. Justice Stevens at pp. 268-269 [47 L.Ed.2d at p. 782].)

In the instant case we are not concerned with any federally created immunity from state taxation. Such immunity presents a special circumstance; whereas, the market value approach to value contemplates the normal sale in a normal market situation.

The California courts, while consistently holding that the legal incidence of the tax is upon the vendor, have always recognized that the ultimate burden of the sales tax, as in the case of all taxes paid in the course of production, will be shifted to the consumer. It is a part of the cost of marketing the property that is passed on to the consumer. "It must be conceded that the purchase price ultimately is necessarily the source from which payment of the tax must be made. The consumer still has the right to purchase or not at the asked price which includes the tax. Any quibbling between the parties, in an attempt to differentiate between the purchase price and the tax by reason of the separate statement of the amount intended as tax reimbursement, will not alter the fact that within the purview of the legislative enactment the *aggregate of the list price and the amount of tax reimbursement constitutes the actual*

---

[2] 12 United States Code section 548 as amended December 1969 [83 Stat. 434] reads as follows: "For the purpose of any tax law enacted under authority of the United States or any State, a national bank shall be treated as a bank organized and existing under the laws of the State or other jurisdiction within which its principal office is located."

*purchase price of the commodity."* (Italics added.) (*De Aryan* v. *Akers* (1939) 12 Cal.2d 781, 786 [87 P.2d 695].)

■ Therefore, under the market value concept, where price is the basis of value, the sales tax is an element of value. The ultimate price the informed seller and buyer agree upon includes the amount of tax reimbursement. The retailer, absent exigent circumstances, would not sell for less, and the buyer purchases only if the value of the product to him justifies the total price.

We are cognizant of the fact that the foregoing California decisions were rendered in sales tax cases and that the case at bench is a property tax case. However, those cases define the nature of the tax, and logic compels recognition of the fact that the definition of price therein set forth is synonymous with market value of property at the consumer level of exchange.

Although our Supreme Court has not had occasion to consider the issue here presented, the same definition of price developed in the California sales tax cases, led the Supreme Court of Ohio to conclude that expenses of transportation, duties and incidental charges incurred in transporting watches from Switzerland to Ohio was an element of their value for property tax purposes. (*Gruen Watch Co.* v. *Evatt* (1944) 143 Ohio St. 461 [55 N.E.2d 794].) Appellant seeks to distinguish the Ohio case on the ground that the import duties had actually been paid by the owner, and presumably would have been considered by the owner when fixing the price it would charge its customers; whereas, in the instant case the appellant has paid no sales tax.

This argument ignores the constitutional requirement that assessment be uniform. (Cal. Const., art. XIII, § 1; *Bauer-Schweitzer Malting Co.* v. *City and County of San Francisco* (1970) 8 Cal.3d 942, 946 [106 Cal.Rptr. 643, 506 P.2d 1019].) It is generally true that appellant has paid no sales tax since there has been no sale.[3] However, the agreed facts and the trial court's findings establish that the leased property is in the hands of the ultimate consumers under long-term leases. Thus, valuation at the consumer trade level is necessary if assessment is to be uniform. The function of the assessor is to find the fair market value of the property in the hands of the person who owns, possesses or controls it on the lien

---

[3]The trial court found that appellant was required to collect a use tax on rentals paid unless the lessees were exempt from the use tax, in which case a sales tax was imposed on the rentals.

date. "By using the trade level concept, the assessor puts all of the identical equipment on the same basis, whether the ultimate user chooses to lease it or to buy it, because its value is the same to all." (*Ex-Cell-O Corp.* v. *County of Alameda, supra,* 32 Cal.App.3d 135, 141.)

Appellant seeks to fortify its argument that sales tax is not a part of price by analogizing the sales tax to the sales commission on mutual fund stock which was considered by the United States Supreme Court in *United States* v. *Cartwright* (1973) 411 U.S. 546 [36 L.Ed.2d 528, 93 S.Ct. 1713]. In that case the court invalidated an estate tax regulation which provided that the fair market value of mutual fund stock is the public offering price of a share at the date of death. (Treas. Reg., § 20.2031-8(b).) The public offering price included a sales commission, which was a varying percentage of the asked price. The price at which the fund would redeem its shares was the net asset value, excluding the sales commission. Appellant misconstrues *Cartwright* as supporting the proposition that where there is a variation between what a buyer would pay in a transaction and what a seller would receive, the market value is what the property brings to the seller.[4]

What the court actually did in *Cartwright* was to reject the two-market concept and adopt the reasoning in *Hicks* v. *United States* (D.C.Colo. 1971) 335 F.Supp. 474, which held that there was only one market, the original market transaction which was a sales contract in which the buyer bought at one price and agreed to sell at a lesser price. The Supreme Court concluded that the redemption price was only the final step in a voluntary transaction between a willing buyer (the investor) and a willing seller (the fund). Thus, by prior agreement the only price that a shareholder could realize and that the fund—the buyer in the final step—would pay was the redemption price.[5] (*United States* v. *Cartwright, supra,* 411 U.S. at p. 556 [36 L.Ed.2d at p. 536, 93 S.Ct. 1713].) In the case at bench the one price agreed upon by the hypothetical willing buyer and willing seller is the total price, including sales tax.

Equally unconvincing is appellant's argument that the Legislature could not have intended the result that the same property would have different values depending on the percent of sales tax imposed in the

[4]This argument is advanced by appellant on the erroneous premise that the price the seller would receive is the list price, since that is all he gets to keep after paying the sales tax imposed upon him for the privilege of doing business.

[5]It is only by adopting this rationale that the redemption price could be held to represent market value. If the single transaction at time of redemption was considered as a separate sale, it would obviously not be free of exigent circumstances.

various counties. Fair market value traditionally depends upon the location of the market. Certainly the costs incurred by the seller, whether for materials, labor or tax, vary depending on the locale in which the business is conducted, and those costs are reflected in the market price. We are concerned for tax purposes not with some esoteric value of the property, but with its value in exchange wherever the market is located.

## 2. *Sales Tax a Part of Cost*

Appellant's contention that sales tax and freight charges are not a part of the cost of the property under the cost method of valuation must also be rejected. The reproduction or replacement cost approach to value is used in conjunction with other value approaches. Where there have been a sufficient number of sales to establish a reliable market price, the selling price of equipment provides the best indicator of replacement cost new. However, the cost approach is most frequently relied on where there is insufficient sales data for selling price to be a reliable indicator. Under these circumstances, the assessor must use other indicators of cost. The addition of taxes and freight charges to the list price of such equipment is consistent with an appraisal approach that gives consideration to the consumer's cost in arriving at market value. It is in accord with general accounting principles. The cost of an asset includes purchase price, brokerage commission, duties, transportation and all costs of placing the asset in a condition for use. (1 Accountant's Encyclopedia (1962) pp. 168-169; see also *Lockheed Aircraft Corp.* v. *County of L. A.* (1962) 207 Cal.App.2d 119, 129-130 [24 Cal.Rptr. 316].)

The real basis for appellant's argument against the inclusion of the sales tax as a part of cost in the cost approach appears to be that the consideration of the consumer's cost assumes a sale, whereas the equipment being appraised is leased. As we have previously observed, the form of the transaction is irrelevant where value is being determined at the consumer trade level. The fair market value of the property is the same whether the ultimate consumer owns it or leases it. (*Ex-Cell-O Corp.* v. *County of Alameda, supra,* 32 Cal.App.3d 135, 141.)

## 3. *Sales Tax in the Income Approach*

The assessors employed a modified income approach for those items which had no list price. As to those items the assessors used a gross

rent multiplier and added sales tax and freight charges, or included a factor for sales tax and freight. Appellant attacks the inclusion of sales tax and freight charges on the ground that, while taxes may be included as a portion of gross income anticipated from leased property, the taxes should either be deducted in arriving at a net return or be accounted for in the capitalization rate.

What appellant has overlooked in this argument is that the assessors did not use a true income approach, they applied a multiplier to the average monthly "gross rent." This oversight is manifested by appellant's reliance on the regulation of the State Board of Equalization describing the income approach to value as follows: "The amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the lien date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date. Net return, in this context, is the difference between gross return and gross outgo. Gross return means any money or money's worth which the property will yield over and above vacancy and collection losses, including ordinary income, return of capital, and the total proceeds from sales of all or part of the property. Gross outgo means any outlay of money or money's worth, including current expenses and capital expenditures . . . required to develop and maintain an estimated income." (Cal. Admin. Code, tit. 18, § 8, subd. (c).)

Gross return, appellant agrees, may be estimated with reference to recently derived incomes and recently negotiated rents including any use taxes paid by the lessee. However, appellant argues, the amount of the use taxes paid by the lessee should then be included in the gross outgo, stating that, "while *taxes may be included as a portion of the gross income anticipated* from the property, these taxes would be either extracted in arriving at a *net return or accounted for in the capitalization rate.*" (Italics added.)

As previously noted, appellant has attempted to describe the true income approach, which if properly applied, would yield a total value of the property.

The variation of the income approach used by the assessor is an income method employing a gross rent multiplier. Ideally such multiplier is obtained by comparing sales prices of, and income derived from, comparable properties.

In the case of the equipment involved in these assessments, such sales prices were unavailable. As set forth in the stipulation entered herein, "Although most of the models of equipment had a list price, very few copiers were actually sold." The vast majority of such equipment is marketed pursuant to lease arrangements similar to that involved in this case. Under these circumstances, the market data available to the assessor consisted of the list prices of comparable equipment and the income derived from the lease thereof.

Neither the stipulation of the parties, nor the judgment of the trial court indicate how the number 35 was developed as a multiplier. Since no sales prices were available, we assume that the assessor used list prices of comparable properties and income derived therefrom to develop the multiplier. However, since appellant has not objected to the multiplier, except for the inclusion of a factor for sales tax and freight, we have no basis upon which to question the method used or the derivation of the multiplier. For this reason we consider only whether the addition of the tax and freight is consistent with the method used, and whether it is calculated to arrive at market value, or stated a different way, do the concepts embodied in the method used by the assessor, including tax and freight, equate with the concepts embodied in the standard income approach. We find that they do.

The capitalized-income method of valuation refers to any procedure whereby the appraiser measures the value of the property by a calculation or estimate of the income or services derived or derivable from the property by its present or a potential owner. (1 Bonbright, Valuation of Property, pp. 230-231.) However, if we are correct in assuming that the assessor developed the multiplier by using *list price* of comparable equipment and the income derived therefrom, then the product of the multiplier times the average monthly rental on the subject property would reflect only the *list price* of the subject property. List price does not equate with market value; it is not the total price of the property at the highest level of exchange, and it does not reflect all of the consumer's costs under the cost approach to value. Furthermore, where gross rent rather than net return is used, then the concepts used must consistently refer to gross rather than net returns. Inasmuch as outgo was not deducted from the gross rent to which the multiplier was applied, we must assume that the multiplier was appropriate to measure the value of property when applied to gross return rather than to net return. Under these circumstances, it would be a distortion of the method used by the

assessor if the calculation failed to include an amount for sales (use) tax and freight charges which appellant admits are properly included in "gross income" from the property.

4. *The Interest of the Taxpayer*

█ The final argument advanced by appellant against the inclusion of the sales tax in assessing the value of the leased property is that, since the amount of any sales tax collected from a hypothetical purchaser must be paid over to the state, the seller has no "interest" in the tax, and hence it is not an element of value. This argument ignores the whole market value concept of valuation. The price at which a willing and informed seller will sell, in the absence of some exigent circumstances, will always include his costs of production, materials, overhead, advertising and other costs of doing business. The sales tax is merely another cost of doing business, measured by the gross receipts of that business.

The same reasoning supports the inclusion of freight or installation charges. "The selling price of personal property manufactured and sold on the market obviously includes, in addition to actual manufacturing cost, sales expense, transportation, installation expenses . . . ." (*State* v. *Board of Review of City of Fond du Lac* (1939) 231 Wis. 303, 315 [285 N.W. 784, 789].)

We have concluded that the method of valuation used by the assessors in these cases is consistent with the constitutional and statutory requirements that all property be assessed in proportion to its fair market value.

The judgment is affirmed.

Tamura, Acting P. J., and Kaufman, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 26, 1977. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.