[Civ. No. 24785. Fourth Dist., Div. One. Feb. 18, 1983.]

COUNTY OF SAN DIEGO et al., Plaintiffs and Respondents, v.
ASSESSMENT APPEALS BOARD NO. 2 OF SAN DIEGO COUNTY,
Defendant and Respondent;
XEROX CORPORATION, Real Party in Interest and Appellant.

## COUNSEL

Sheppard, Mullin, Richter & Hampton, Robert Joe Hull and Lawrence M. Braun for Real Party in Interest and Appellant.

Donald L. Clark, County Counsel, Joseph Kase, Jr., Acting County Counsel, Lloyd M. Harmon, Jr., Chief Deputy County Counsel, and Ralph E. Shadwell, Deputy County Counsel, for Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

## OPINION

**COLOGNE, Acting P. J.—**  There is a single issue in this case: whether for purposes of property tax valuation of personal property the assessor, using

the income approach to valuation, may include in the value of leased equipment at the consumer trade level an amount representing imputed sales tax.

The San Diego County Assessor included an imputed sales tax figure of 5 percent in the March 1, 1974, lien date assessment of copier products manufactured and owned by Xerox Corporation, but leased to various customers in the county. The county's Assessment Appeals Board No. 2 determined the full cash value by deleting the sales tax imputed amount. On the county's petition for writ of mandamus and based on a stipulation of facts, the superior court held it was proper to include the figure for imputed sales tax in the valuation, vacated the appeals board decision, with directions, and ordered Xerox to pay the county $26,944 in taxes refunded to Xerox as a result of the erroneous decision. Xerox appeals.

Leasing is the primary means by which Xerox markets its copier products consisting of office copying and related accessory equipment. Though its leases permit shorter terms, Xerox expects the leases to extend at least six months. The lessee remits to Xerox a monthly rental based on a cost per copy metered by the machine with a minimum rental charge. There are various models of copiers involved and thus the rental amount varies based on model, volume of use and pricing plan pursuant to which the copier is leased.

Xerox pays all personal property taxes and all maintenance costs on the leased copier products. The customer remits a monthly use tax, separately stated on the invoices, with the rental payment to Xerox which in turn remits the tax to the State of California.

Although most of the Xerox copier products have published selling prices, very few outright sales are made. In San Diego County, Xerox had in excess of 3,000 machines. In the year before March 1, 1974, only five sales were made in San Diego County. Nationwide, it has been estimated Xerox has sold only two-tenths of 1 percent of all machines manufactured.

The assessor generally utilizes two valuation approaches in valuing property of the type owned by Xerox. The property may be valued by the cost approach to value, based upon the current list price, depreciated on a straight line six-year basis, with sales tax included in the final conclusion. The property may also be valued by the income approach to value, pursuant to which the assessor uses a remaining economic life up to six years, with a 2 percent salvage value and with sales tax included in the final value. In the year under appeal, 1974, because the number of sales of like equipment was insufficient to make list price a reliable indicator of value, the assessor used a true income approach based upon a capitalization of anticipated net income and the addition of an imputed 5 percent sales tax to arrive at the full cash value determination. In

utilizing this method, the assessor determined the net income that could reasonably be expected to be generated by the property and capitalized the net income (using a factor to include yield, recovery of investment and property taxes) to determine its present worth. To this figure the assessor added 5 percent as imputed sales tax.

Xerox does not dispute the basic method of valuation of its property, i.e., use of the true income approach at the consumer trade level. The sole issue in dispute is the propriety of the addition of the 5 percent imputed sales tax to the value determination derived pursuant to an income approach to value as utilized by the assessor. The dollar amount of full cash value determination attributable to the inclusion of sales tax was approximately $278,333.

The essence of the assessment situation involved here, use of the trade level concept in evaluating leased property, is described in the following passage from *Ex-Cell-O Corp.* v. *County of Alameda* (1973) 32 Cal.App.3d 135, at page 141 [107 Cal.Rptr. 839]:

"As applied to leased equipment, the trade level theory is designed to produce equity between taxpayers. If it were not applied, and in the years before it was applied, the taxpayer who owned business equipment would be taxed on the basis of the selling price to him, reduced by such factors as depreciation and obsolescence. But in the case of leased equipment, the taxpayer, in this instance the lessor, would be taxed on the basis of the cost of producing the equipment. The purpose of the assessor is to find the fair market value of any given property in the hands of the person who holds it on the lien date of any year. *By using the trade level concept, the assessor puts all of the identical equipment on the same basis, whether the ultimate user chooses to lease it or to buy it, because its value is the same to all.* [Fn. omitted.] In the case of leased equipment, the assessment is to the lessor and although there may be a contractual arrangement between the lessor and the lessee, this of course has no effect upon the action of the lessor. In the case of manufacturers who do not sell any equipment but only lease it, capitalization of income from the leasing is used to establish value." (Italics added.)[1]

---

[1] In a footnote attending this passage, the court explains the trade level assessment theory and practice further as follows:

"The trade level principle is expressed succinctly in Ehrman & Flavin, Taxing California Property, section 380, page 346, as follows: 'Inventory includes raw materials, work in process, and finished goods. It is taxable in all these stages. Moreover, since goods which are finished to a manufacturer may only be materials to a purchaser, it is apparent that more than one cycle of trade levels may occur between the first processor and the consumer. Unlike the situation in valuing equipment, therefore, the trade level is an important consideration in the property valuation of inventory, whether the trade level be manufacturing, retail, or consumer. At the consumer level, of course, the property ceases to be inventory. The new regulations issued by the State Board of Equalization on valuation principles and procedures specifically require the assessor to give recognition to trade level and the principle that property normally in-

The basic principles of assessment practice applicable to this case are also detailed in *Xerox Corp.* v. *County of Orange* (1977) 66 Cal.App.3d 746 [136 Cal.Rptr. 583], which rejected an identical attack by Xerox on the inclusion of sales tax in the valuation by five county assessors for the fiscal year ending June 30, 1972. The assessment methods used by the assessors in *County of Orange* differed from the true income method used here (see 66 Cal.App.3d at pp. 751-752). However, the goal the assessors attained, arriving at "full cash value," "market value," or "value" (Cal. Const., art. XIII, § 1, as amended 1962; Rev. & Tax. Code, § 110, as amended Stats. 1971, ch. 1542),[2] and in the process including the sales tax figure, was fully approved. It is thus apparent *County of Orange* furnishes good authority for this case in terms of the principles it states with respect to adding the sales tax figure in arriving at value.

---

creases in value as it progresses through production and distribution channels to the consumer level.' In the 1973 Supplement, page 112, the following is added: 'The State Board's rules expressly provide that tangible personal property in the hands of the consumer must be valued in accordance with the comparative sales, cost or income method. An exception, however, is property which the taxpayer leases or rents for a period of less than six months, which is to be valued by reference to the property's cost to the lessor, or the price at which the lessor could be expected to sell it, less his experienced gross profit.'

"A detailed account of the procedure for assessing tangible personal property at the trade level is given in title 18, section 10 of the California Administrative Code."

[2]*County of Orange* initially points out:

"*The Constitution of California provided on the lien dates applicable to these proceedings: 'All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided.'* (Cal. Const., art. XIII, § 1 [as amended in 1962].)

"The legal standard of value in California, which has been described variously as 'value,' 'cash value,' and 'full cash value,' was defined on the lien date in question as: '. . . the amount *at which property would be taken in payment of a just debt from a solvent debtor.'* (Rev. & Tax. Code, § 110 [Stats. 1941, ch. 605, § 1, p. 2052].) This has been construed by the California Supreme Court to require that property be assessed at 'the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. It is a measure of desirability translated into money amounts [citation], and might be called the market value of property for use in its present condition.' (*De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 562 [290 P.2d 544].) Thus, the standard of value for assessment is market value. Indeed, in amending section 110 of the Revenue and Taxation Code to incorporate the *De Luz* definition of full cash value, the Legislature employed the term 'fair market value' as interchangeable with 'full cash value.'" (66 Cal.App.3d 746, 752-753.)

From the court's reference to the Legislature's adoption of the *De Luz* definition, it becomes clear the 1971 legislation applicable to this case is subject to the same observations. Revenue and Taxation Code section 110, as added by chapter 1542 of the Statutes of 1971 (operative Mar. 1, 1972), reads:

" 'Full cash value' or, 'market value' or, 'value' means the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes."

The statute and the Constitution have since been amended in ways not relevant to the issues in this case.

Some of the salient observations in *County of Orange* are, "[f]air market value contemplates a hypothetical transaction between an informed seller, being under no compulsion to sell, and an informed buyer, being under no compulsion to buy." (66 Cal.App.3d at p. 753.) The income approach to appraisal is a valid indicator of value because it recognizes "those market forces that affect the price at which knowledgeable buyers and sellers would arrive in an arm's length transaction" (*ibid.*).

In the context of property moving through and being assessed at various levels of production or distribution, and with an eye to attaining fair and uniform appraisals, *County of Orange* further observes, "costs incurred in producing and marketing property are elements which in common experience ordinarily determine value" (*County of Orange, supra,* 66 Cal.App.3d 746, 754). The regulations require assessors to recognize the trade level at which the property is situated on the lien date and "the principle that property normally increases in value as it progresses through production and distribution channels" (Cal. Admin. Code, tit. 18, § 10). And, while property at the ultimate consumer level of trade must under the regulations be valued according to one of the standard methods of appraisal, i.e., comparable sales approach, reproduction or replacement approach, or income approach (Cal. Admin. Code, tit. 18, § 10, subds. (d), (e)), the trade level concept is nevertheless useful in assessing leased equipment such as we consider here.

Usefulness of the trade level concept, even when considering the income approach to valuation, derives from the fact "it establishes the trade level at which the property is to be appraised, and it focuses on the elements that help establish the market price" (*County of Orange, supra,* 66 Cal.App.3d 746, 755). Citing *Ex-Cell-O Corp.* v. *County of Alameda, supra,* 32 Cal.App.3d 135, 141, the court made this important observation:

"*[T]he trade level theory produces equity* between taxpayers *by assuring that the taxpayer consumer who owns his equipment will pay the same tax on identical equipment as the taxpayer who leases the equipment to the ultimate consumer. The market value of the equipment is the same if the property is held by the ultimate consumer* regardless of who pays the tax.

"Also, because the consideration of the various levels of production compels an awareness of the costs incurred at each level of production and marketing, the relationship between the costs of preparing and marketing the property and the ultimate market price becomes more apparent." (66 Cal.App.3d at p. 755; italics added.)

In the context of these observations and rules, *County of Orange* considered Xerox' argument that sales tax (and freight or installation charges) are not part

of the value in exchange at the consumer trade level (*County of Orange, supra,* 66 Cal.App.3d 746, 755). Largely as it does in this case, Xerox in *County of Orange* contended inclusion of the sales tax is improper on the following grounds:

"(1) The sales tax that a seller may collect is not part of the 'price' that the parties would agree upon in the market value approach.

"(2) The sales tax and freight charges are not a part of the 'cost' of the property under the cost method of valuation.

"(3) The inclusion of sales tax is a distortion of the income method of valuation.

"(4) The sales tax is an item in which [Xerox] has no interest."

*County of Orange* held to the contrary on each point.

Here, under the heading that the assessor's method of valuation was invalid, Xerox argues the assessor's final step of adding imputed sales tax under the apparent theory this is required because the property is at the consumer level, is incorrect because it wrongly confuses the level of trade concept with the income approach method of valuation utilized. Xerox recognizes its equipment here, leased for an indefinite period or longer than six months, must be valued at the highest level of exchange (Cal. Admin. Code, tit. 18, § 10, subd. (e)). It asserts, however, none of the standard methods of valuation including the income approach is designed to produce "recorded cost" or "cost," in the accounting sense, and it claims the assessor's method assumes the consumer trade level requires a determination of the consumer's book cost as a measure of value.

Xerox is here making a hypertechnical argument which ignores principles enunciated in *County of Orange* concerning the market approach. Particularly, Xerox ignores the hypothetical transaction contemplated in the process of arriving at fair market value (66 Cal.App.3d at p. 753), the constitutional need for uniformity and fairness in arriving at an appraisal of the same item of property at the same level of trade (66 Cal.App.3d at p. 758), here the consumer level, and the reality that "under the market value concept, where price is the basis of value, the sales tax is an element of value" (*ibid.*). If the owner of an item of property at the consumer level of trade is subject to application of a sales tax element in the valuation of this property, then the lessor of the same item of property at the same level of trade must be subject to the same sales tax element. Otherwise, uniformity of assessment is demolished.

Xerox claims the assessor's method of capitalization of income, with the addition of sales tax, causes an overvaluation. The income approach results in a valuation figure for "the present worth of a future income stream" (Cal. Admin. Code, tit. 18, § 8, subd. (b)). As Xerox explains:

"Furthermore, '[t]he amount to be capitalized is the net return which a reasonably well informed owner and reasonably well informed buyers may anticipate on the lien date that the taxable property existing on that date will yield under prudent management and subject to such legally enforceable restrictions as such persons may foresee as of that date.' [Cal. Admin. Code, tit. 18, § 8, subd. (c).] The State Board defines net return as the difference between 'gross return' and 'gross outgo.' Gross return is defined as 'any money or money's worth which the property will yield over and above vacancy and collection losses . . . .' Gross outgo means 'any outlay of money or money's worth, including current expenses and capital expenditures (or annual allowances therefor) required to develop and maintain the estimated income.' [*Ibid.*]

"The net return is capitalized at a rate that returns to the investor his investment in the property, a return or yield on that investment and expenses such as property taxes that are not properly included in gross outgo. [Cal. Admin. Code, tit. 18, § 8, subd. (g).] An example of the use of an income approach as applied to leased personal property is set forth in *Assessors Handbook* 571, at pages 91 through 94. Courts may take judicial notice of the Assessors Handbook, which is published by the State Board to assist assessors in performing their duties. *Hunt-Wesson Foods, Inc.* v. *County of Alameda,* 41 Cal.App.3d 163, 180 (1974)."

The assessor's method is straight line declining income method. This method "assumes that the income will decline an equal amount each period. It also provides for equal amortization of the investment each period. The decline in income each period equals the amount amortized times the sum of the yield and tax rates." (Assessor's Handbook 501-82.)

By way of example, Xerox illustrates what result it believes application of the Assessor's Handbook method should obtain and what result the assessor's method actually brings. ■ The problem with the latter example is it is founded on an unnecessarily narrow construction of title 18, California Administrative Code, section 8, subdivision (e), which reads, in part: "Recently derived income and recently negotiated rents or royalties (*plus any taxes paid on the property by the lessee*) of the subject property and comparable properties should be used in estimating the future income . . . ." (Italics added.)

The emphasized phrase is not limited to property taxes as Xerox asserts, but may apply to *any* taxes on the property, including sales or use tax. Moreover,

inclusion of sales or use tax in the gross income column does not give rise to the need to wash it out again by also placing it in the gross outgo column.[3] It is not as Xerox asserts, purely a matter of comparing sales or use tax with property tax which is not put into gross outgo because property tax is automatically included in the capitalization rate, or of comparing those taxes with corporate net income tax or corporate franchise tax which are not included in gross outgo because they are provided for in the capitalization rate or by deriving a capitalization rate from actual sales and incomes before income taxes. Nor is it simply a matter of concluding, as Xerox suggests, since the use tax is an expenditure necessary to maintain the income stream, it must under the definition of gross outgo be included in it.

█ Rather, attention must be given to the unique, key feature of this case, that we are dealing with and using figures for leased property and the income to the lessor from that property, all at which is ordinarily the retail trade level. Yet, a valuation at the consumer trade level is what is required. Adjustment to the Assessor's Handbook method of capitalizing income must be made to obtain a valuation at the consumer trade level rather than the retail trade level. Otherwise, nonuniformity of assessment will be the result. The adjustment here made by the assessor was proper to achieve a valuation at the consumer trade level.

Xerox' contention the assessor's reliance on *County of Orange* is erroneous because the case did not involve application of a true income approach does not lead to any conclusion that might be beneficial to Xerox, and thus need not be discussed.

Next, Xerox contends the decision in the *County of Orange* case was erroneous and, to the extent it is relevant to this case, should not be followed. We have examined the discussion, analysis and authorities relied upon in the *County of Orange* case and find it is soundly decided, particularly with respect to the basic assessment principles in connection with the market approach it sets forth and applies. Recognizing *County of Orange* dealt with different appraisal methodology than is involved here, we do not consider its holdings on specific issues tied to those facts to be directly binding. We do not intend to again explore the question of sales tax as an element of value because that point was fully and convincingly decided in *County of Orange* (66 Cal.App.3d at pp. 756-760). The sales tax is a part of the "price" for assessment purposes. We have already concluded, as did *County of Orange,* the level of trade concept does support the addition of sales tax. Accordingly, no further discussion of the *County of Orange* case is required.

---

[3]Incidentally, there is no mathematical difference in result, due to the assessor's method of capitalizing the present worth of the rental payments and then adding to that value the present worth of sales tax, rather than capitalizing the taxes paid along with the lessee's rental payments representing the income stream.

Judgment affirmed.

Staniforth, J., and Wiener, J., concurred.

A petition for a rehearing was denied March 9, 1983, and appellant's petition for a hearing by the Supreme Court was denied April 28, 1983. Mosk, J., Richardson, J., and Broussard, J., were of the opinion that the petition should be granted.