Filed 8/30/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B271109 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA427718) |
| v. | |
| TROY EARL SEALS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carol H. Rehm, Jr., Judge. Affirmed as modified.

Katherine E. Hardie, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie C. Brenan and Abtin Amir, Deputy Attorneys General, for Plaintiff and Respondent.

_____

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, Section I of this opinion is certified for publication.

In 2014, Troy Seals stole a cellphone from a store. A confrontation with the storeowner ensued, during which Seals pulled out a knife as he attempted to flee. The People charged Seals with second degree robbery (Pen. Code, § 211) and second degree commercial burglary (Pen. Code, § 459).[1] At trial, the evidence established the storeowner typically sold the phone Seals stole for $899, plus sales tax, which increased the price to almost $1,000. The jury found Seals guilty on both counts. The trial court found true several prior conviction allegations.

On appeal, Seals contends substantial evidence does not support his burglary conviction because the evidence established the price of the phone was less than $950, and the jury could not consider sales tax as part of the phone's value. He also contends substantial evidence does not support his robbery conviction. Seals further asserts the trial court erred in denying his *Romero* motion,[2] and that his 25-years-to-life sentence for robbery violates the Eighth Amendment's prohibition against cruel and unusual punishment. We modify the judgment to correct the presentence custody credits awarded and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In July 2014, Seals walked into Hot Spot Wireless, a cellphone store. Seals asked Adilmar Hernandez, a store clerk, about a pair of headphones and whether he could "get a better price" on them. Hernandez went to the back of the store to ask the storeowner, German Flores, if he could negotiate the price of the headphones. While discussing the matter with Flores,

---

[1]    All further undesignated section references are to the Penal Code unless otherwise stated.

[2]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

Hernandez heard the shop's front door beep, indicating someone had entered or exited the store. On a television feed of the store's security camera, Hernandez saw Seals leaving with a bag. When Hernandez and Flores returned to the sales floor they noticed a phone was missing from the display case.

Flores chased after Seals. When Flores was eight feet away from Seals, he confronted Seals, saying: "[G]ive me the fucking phone." Seals denied having the phone and kept walking, at a faster pace. Flores continued to follow Seals, demanding that he return the phone. Eventually, as Flores closed the gap between the two men to six feet, Seals pulled out a nine-inch knife. Seals held the knife by his side and said: "Get away from me. I don't have your phone."

When Flores saw the knife he was hesitant and "a little bit scared"; after he saw the knife he stopped going after the phone. Flores thought Seals might use the knife. He began to look for something to use to protect himself. Still, he continued following Seals, demanding that he return the phone. Flores testified at trial that he was determined to get the phone back because he had no insurance to cover the loss. In an effort to get closer to Seals, Flores threw a rock at him; Seals responded by throwing rocks at Flores. Eventually, police arrived and arrested Seals. Flores retrieved the phone, which was on the ground near where the men had thrown rocks. The knife was found nearby.

A jury found Seals guilty of second degree robbery and second degree commercial burglary. The trial court thereafter found true the prior conviction allegations as to five of Seals's

prior criminal prosecutions.  The court sentenced Seals to a total state prison term of 35 years to life.[3]

## DISCUSSION

**I.**     **The Jury Properly Included Sales Tax in Determining Whether Seals Entered the Property with Intent to Steal an Item with a Value Greater than $950.**

In 2014, the People charged Seals with one count of commercial burglary in violation of section 459.  By the time of trial in 2016, the electorate had enacted Proposition 47, which added section 459.5 to the Penal Code, creating a separate offense of "shoplifting."  Under section 459.5, "shoplifting is defined as entering a commercial establishment with intent to commit larceny while that establishment is open during regular business hours, where the value of the property that is taken or intended to be taken does not exceed nine hundred fifty dollars ($950).  Any other entry into a commercial establishment with intent to commit larceny is burglary."  Shoplifting under this provision is a misdemeanor.  Further, under section 459.5, subdivision (b), any act of shoplifting must be charged as such and no person charged with the crime may also be charged with burglary or theft of the same property.

---

[3]     On the robbery count, the trial court imposed a sentence of 25 years to life.  The court imposed a sentence of six years on the burglary count—three years, doubled pursuant to the Three Strikes law—and stayed pursuant to section 654.  The court further imposed a total 10-year determinate sentence based on two five-year priors (§ 667, subd. (a)(1)).

Thus, to establish a violation of section 459 in this case, the People were required to prove the property Seals stole had a value exceeding $950. At trial, Flores testified that at the time of the crime, he usually sold the phone for $899, which, with tax, was "nine-fifty. Almost 1,000." There was no evidence that, excluding sales tax, Flores ever sold the phone for more than $950. To convict Seals of burglary, the jury had to include sales tax in its determination of the value of the phone.

In the lower court and on appeal, Seals has argued it was improper for the jury to include sales tax as part of the value of the phone. Although Seals frames this issue as one of sufficiency of the evidence, the threshold question does not involve disputed facts. Instead, whether sales tax could be included in the calculation of value is a legal question, which we review de novo. (*People v. Perkins* (2016) 244 Cal.App.4th 129, 136; *People v. Cuellar* (2008) 165 Cal.App.4th 833, 836.)

**A. Establishing Value in Theft Crimes in California**

Under section 484, subdivision (a), which defines theft, "[i]n determining the value of the property obtained, for the purposes of this section, the reasonable and fair market value shall be the test." "[C]ourts have long required section 484's 'reasonable and fair market value' test to be used for theft crimes that contained a value threshold. . . ." (*People v. Romanowski* (2017) 2 Cal.5th 903, 914 [Proposition 47 did not change this valuation approach].)

As explained in *People v. Pena* (1977) 68 Cal.App.3d 100 (*Pena*), "When you have a willing buyer and a willing seller, neither of whom is forced to act, the price they agree upon is the highest price obtainable for the article in the open market. Put another way, 'fair market value' means the highest price obtainable in the market place . . . ." (*Id.* at p. 104.) Further, in a

retail context, absent proof "that the price charged by a retail store from which merchandise is stolen does not accurately reflect the value of the merchandise in the retail market, that price is sufficient to establish the value of the merchandise within the meaning of sections 484 and 487." (*People v. Tijerina* (1969) 1 Cal.3d 41, 45.)

California courts have established these general principles for determining the value of property in a theft crime, yet no court has expressly considered whether sales tax may be included in the valuation.

### B.  Sales Tax and Fair Market Value

To evaluate this issue, we first consider the nature of the sales tax in California.

"The sales tax is imposed on retailers '[f]or the privilege of selling tangible personal property at retail.' [Citation.]" (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1104 (*Loeffler*).)  It is a longstanding principle that in this state, "[t]he *retailer* is the taxpayer, *not* the consumer.  'The tax relationship is between the retailer only and the state; and is a direct obligation of the former.' [Citation.]" (*Ibid,* fn. omitted.)  Retailers pay sales tax on their gross receipts, not on a per item basis.  (*Ibid;* Rev. & Tax. Code, § 6051; *Roth Drug, Inc. v. Johnson* (1936) 13 Cal.App.2d 720, 737 [the sales tax law contemplates imposing a fixed rate of tax on gross receipts and not on each particular sale of merchandise].)

"[A]lthough the sales tax falls on retailers and must be paid by them to the state, retailers *are permitted but not required* to obtain reimbursement for their tax liability from the consumer at the time of sale.  [Citations.]  Whether a reimbursement amount will be added is purely a matter of contract between the retailer

6

and consumer. [Citations.] It is presumed that the parties agreed to the addition of sales tax reimbursement to the sales price if the sales agreement so states, if the sales tax reimbursement is shown on the sales check, or if the retailer posts a notice or notifies consumers by specified methods that reimbursement for sales tax will be added to the sales price of all items or certain items. [Citations.]" (*Loeffler, supra,* 58 Cal.4th at pp. 1108-1109; *Livingston Rock & Gravel Co. v. De Salvo* (1955) 136 Cal.App.2d 156, 160-164.)

The People primarily rely on one civil case to support the argument that sales tax may be included in a fair market value determination. In *Xerox Corp. v. County of Orange* (1977) 66 Cal.App.3d 746 (*Xerox*), the parties disputed whether sales tax could be considered in the valuation of property subject to a personal property tax. County assessors included sales tax in the calculation of the fair market value of office copying machines and related equipment the plaintiff, Xerox, leased to its customers. (*Id.* at pp. 750-751.) To determine the tax owed on the copiers and equipment, county assessors used the list price for new equipment and added sales tax, and, in some cases, freight charges, to arrive at the "full cash value" of the property. (*Id.* at pp. 751-752.) Xerox argued the inclusion of sales tax and freight charges was improper; the court disagreed.

The *Xerox* court began its analysis by noting the legal standard of full cash value for assessment under the California Tax Code is "fair market value." In turn, "[f]air market value contemplates a hypothetical transaction between an informed seller, being under no compulsion to sell, and an informed buyer, being under no compulsion to buy." (*Xerox*, *supra*, 66 Cal.App.3d at pp. 752-753.) Xerox contended sales tax was not part of the

7

purchase price the parties would agree upon in a market value approach. (*Id.* at p. 756.) The appellate court rejected this argument based on the nature of the sales tax. The court explained:

"The California courts, while consistently holding that the legal incidence of the tax is upon the vendor, have always recognized that the ultimate burden of the sales tax, as in the case of all taxes paid in the course of production, will be shifted to the consumer. It is a part of the cost of marketing the property that is passed on to the consumer. 'It must be conceded that the purchase price ultimately is necessarily the source from which payment of the tax must be made. The consumer still has the right to purchase or not at the asked price which includes the tax. Any quibbling between the parties, in an attempt to differentiate between the purchase price and the tax by reason of the separate statement of the amount intended as tax reimbursement, will not alter the fact that within the purview of the legislative enactment the *aggregate of the list price and the amount of tax reimbursement constitutes the actual purchase price of the commodity.*' (Italics added.) [Citation.] [¶] Therefore, under the market value concept, where price is the basis of value, the sales tax is an element of value. The ultimate price the informed seller and buyer agree upon includes the amount of tax reimbursement. The retailer, absent exigent circumstances, would not sell for less, and the buyer purchases only if the value of the product to him justifies the total price." (*Xerox*, *supra*, 66 Cal.App.3d at pp. 757-758.)

Xerox also asserted sales tax should not be included since it would result in different valuations of the same property depending on the county. The court rejected this argument: "Fair market value traditionally depends upon the location of the market. Certainly the costs incurred by the seller, whether for materials, labor or tax, vary depending on the locale in which the business is conducted, and those costs are reflected in the market price. We are concerned for tax purposes not with some esoteric value of the property, but with its value in exchange wherever the market is located." (*Xerox, supra,* 66 Cal.App.3d at p. 760.)

Xerox additionally contended sales tax should not be included in fair market value because the tax amount collected from a hypothetical buyer must be paid over to the state, thus the seller has no interest in the tax. The court rejected this argument as ignoring the market value concept of valuation: "The price at which at which a willing and informed seller will sell, in the absence of some exigent circumstances, will always include his costs of production, materials, overhead, advertising and other costs of doing business. The sales tax is merely another cost of doing business, measured by the gross receipts of that business." (*Xerox, supra,* 66 Cal.App.3d at p. 763; *County of San Diego v. Assessment Appeals Bd. No. 2* (1983) 140 Cal.App.3d 52 [accord].)

**C.  The Jury Properly Considered Sales Tax When Determining the Fair Market Value of the Phone on the Section 459 Charge**

Although *Xerox* arose in a different context from this case we find the court's reasoning relevant and persuasive. In criminal cases, as in *Xerox* and other civil cases in this state, "fair market value" has been interpreted as what an item

9

"would be sold for in the open market if neither buyer nor seller was under any urgent necessity to either buy or sell" the item. (*Pena, supra,* 68 Cal.App.3d at p. 103; *City of Perris v. Stamper* (2016) 1 Cal.5th 576, 598-599 [same definition in condemnation case]; Code Civ. Proc., § 1263.320, subd. (a); *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 141-142 [accepted definition of market value in California]; *Pacific States Sav. & L. Co. v. Hise* (1945) 25 Cal.2d 822, 837-840 [definition appropriate in valuation of corporate assets]; *People v. Cook* (1965) 233 Cal.App.2d 435, 438.)

Given the nature of the sales tax in California, sales tax reimbursement may properly be viewed as part of the price a willing buyer and seller, neither of whom is forced to act, agree upon. A seller is not required to seek sales tax reimbursement from the buyer. As a result, as the *Xerox* court noted, the sales tax is similar to other factors retailers take into consideration to increase the price of an item, such as overhead and advertising. When the retailer chooses not to absorb the sales tax and instead seeks sales tax reimbursement from the buyer, that is "purely a matter of contract between the retailer and consumer." (*Loeffler, supra,* 58 Cal.4th at p. 1108.)

In adding sales tax reimbursement to the price of an item, the retailer is not merely collecting a tax on behalf of the state. Instead, the retailer is passing on a cost—for which only it is responsible—to the buyer. Further, when a retailer adds an amount for sales tax reimbursement to the total price of an item, that ultimate price is the highest price to which the willing and informed buyer and seller agree. We agree with the *Xerox* court that the fair market value test allows for inclusion of sales tax reimbursement in the valuation when price is the basis of value.

10

Although this is a criminal case, we see no basis to adopt a different interpretation of the fair market value test, or how retail goods should be valued under that test, when value is an element in a theft crime.

Seals relies on several cases from other states to support his argument that the sales tax should not be included in value. We do not find these cases persuasive. For example, in *State v. Alexander* (1987) 12 Kan.App.2d 1 (*Alexander*), the appellate court reasoned that "[u]pon the retail sale of merchandise, Kansas law obligates a merchant to collect and forward a sales tax to the state. [Citation.] In no sense may a theft be characterized as a sale. [Citation.] Because the sweaters had not been sold, [the store from which the defendant stole the items] did not owe, and the state was not entitled to collect, a sales tax on them. . . . [¶] . . . Because no sales tax had been imposed, none was stolen." (*Id.* at pp. 4-5.)

Similarly, in *State v. Kluge* (Iowa Ct. App. 2003) 672 N.W.2d 506 (*Kluge*), the appellate court concluded sales tax is "not truly a component of the 'value' of a good or service, but rather a separate amount collected by a retailer for the benefit of a governmental taxing authority. It is a fee collected because of a transaction." (*Id.* at p. 509.) The court further noted that "[w]ith the determination of a sales tax does not increase the value of property, we conclude our statutory scheme . . . does not allow for the addition of sales tax on an item not yet purchased." (*Ibid;* accord *Russell v. State* (2006) 367 Ark. 557 [242 S.W.3d 265].)

*Alexander*, *Kluge,* and several courts in other states have also adopted the reasoning of two New York trial courts which concluded sales tax should not be included in the value of property to determine the degree of a criminal offense: *People v.*

11

*Barbuto* (N.Y. Sup. Ct. 1980) 434 N.Y.S.2d 120 (*Barbuto*) and *People v. Medjdoubi* (N.Y. Sup. Ct. 1997) 661 N.Y.S.2d 502. Both courts concluded the sales tax may increase the cost to the buyer but does not increase the value of stolen property. (See generally Annot., Consideration of Sales Tax in Determining Value of Stolen Property of Amount of Theft (1998) 63 A.L.R.5th 417 [collecting cases]; *Foreman v. U.S.* (D.C. Ct. App. 2010) 988 A.2d 505 [following *Russell* and *Medjdoubi*].) The *Barbuto* court reasoned the price and sales tax are distinct; the storekeeper "establishes value by the freely negotiated price," but separately "collects a tax for the benefit of the State and locality." (*Barbuto, supra,* at pp. 121-122.)

However, unlike the sales tax law and administration described in several of the cases from other jurisdictions, California law does not obligate a merchant to collect a sales tax from the customer. (See e.g., *Barbuto, supra,* 434 N.Y.S.2d at p. 122 [in New York, "a vendor is required to collect the tax from each customer when collecting the price charged for each item of personal property which he then holds as trustee for and on account of the State"].) This is a significant distinguishing factor. In California, whether the retailer seeks a sales tax reimbursement from the customer is a matter of contract between the buyer and seller. Under this sales tax framework, the addition of sales tax reimbursement to the cost of an item is an indication of that item's fair market value: the total and highest price to which the willing buyer and seller agree.

Some states have concluded sales tax should not be included in the value of stolen property because there was no sale to trigger the imposition of the sales tax. (See e.g., *Alexander, supra,* 12 Kan.App.2d at p. 817; *Kluge, supra,* 672 N.W.2d at

12

p. 509; see also *State Farm Mut. Auto. Ins. Co. v. Berthelot* (La. 1999) 732 So.2d 1230, 1235 [insurance reimbursement did not include sales tax on sale price of vehicle; no taxable event occurred]; cf. *Tunnell v. State* (1983) 99 N.M. 446 [sales tax cannot be included in determining value of shoplifted item unless the total advertised retail or actual market price of the item included the applicable tax].)

Seals adopts this reasoning, arguing a stolen item would not be included in a store's gross receipts, thus the merchant would not be liable for any associated tax. In our view, the lack of a "sale" is irrelevant. Determining the fair market value of an item involves a hypothetical transaction between an informed buyer and seller—not the details of any actual particular sale. (See *Xerox, supra,* 66 Cal.App.3d at pp. 758-760.) So long as there is evidence that, in that hypothetical transaction, the ultimate price the willing and informed seller and buyer agree upon would include sales tax reimbursement, that ultimate price is the fair market value. That the item stolen was not purchased, so that sales tax did not actually come into play, does not change the fair market value determination.

We note our conclusion that sales tax reimbursement may be included in determining the fair market value of stolen retail property is consistent with decisions of several federal courts that have also considered the question. For example, in *U.S. v. Draves* (7th Cir. 1997) 103 F.3d 1328 (*Draves*), the court rejected the argument that sales tax should be excluded from the calculation of a threshold jurisdictional value under 15 United States Code section 1644, which punishes the knowing use of a fraudulently obtained credit card to acquire anything with an aggregate value of $1000 or more. (*Draves*, *supra*, at pp. 1331-

1332.)  The *Draves* court explained:  "The fair market value of property is commonly defined as the price a willing buyer would pay a willing seller for the property, when neither is under compulsion to buy or sell.  [Citations.]  In states that levy sales tax, buyers necessarily consider this mandatory amount in determining what they are willing to pay for an item."  (*Id.* at p. 1332; see also *U.S. v. Burns* (9th Cir. 1990) 894 F.2d 334, 336 ["in ordinary retail trade the amount that a willing buyer is prepared to pay includes the tax and shipping costs, regardless of who ultimately receives that fraction of the purchase price"]; *People v. Bazo* (N.Y. Sup. Ct. 1988) 529 N.Y.S.2d 432.)

Here, the jury could properly consider the sales tax reimbursement in determining the reasonable and fair market value of the phone Seals stole.  While there was no testimony about the exact amount attributable to sales tax reimbursement, Flores testified that he usually sold the phone for an amount that, including tax, was over $950 and close to $1,000.  The evidence presented at trial supported the jury's conclusion that the value of the phone exceeded $950.[4]

---

[4]      In his reply brief on appeal, Seals argues there was insufficient evidence of the value of the phone because, in addition to testifying that he sold the phone, with sales tax, for almost $1,000, Flores also testified he bargained on the price of the phone, the "average market value" for the phone at the time was "like 499, 500," and "most people" sold them at that time for "600, 599."  However, on appeal, we do not resolve evidentiary conflicts, but instead " 'review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  If sales tax was properly considered in the

14

**II.    Substantial Evidence Supports Seals's Conviction for Second Degree Robbery under Section 211.**

Seals argues there was insufficient evidence of the force or fear element of robbery because Flores testified he was not afraid and he continued to chase Seals even after seeing a knife. We disagree.

**A.  Background**

At trial, the prosecutor asked Flores whether he was afraid when he saw that Seals had a knife.  The following colloquy ensued:

> "Q: When you saw the knife – let me ask you this. Before then were you afraid?
> A: I was hesitant and a little bit scared, yes.
> Q: Before you saw the knife?
> A: Before I saw the knife, no.
> Q: Now you see the knife. Does that make you stop?
> A: I stopped going after the phone, yes.
> Q: Okay. Were you afraid of being harmed?
> A: I wasn't afraid of being harmed.
> Q: You were not afraid?
> A: Correct, sir.
> Q: Did the thought of him using that knife go through your head?
> A: I thought of him using the knife.  That's correct that came to my mind as soon as I saw him like that, but I guess I stopped and reacted.

valuation of the phone, there was sufficient evidence to support the conviction.

Q: Now, you said you weren't afraid. I mean tell us why you weren't afraid when you see this knife and you believe you could be harmed with that?
A: I don't want to make a joke out of this, but I play rock, scissors, paper. So I figured rock and scissors, you know. I figured look for something to protect myself.
Q: So you tried to protect yourself?
A: That's correct."

A short time later during the testimony, Flores apparently became distraught. The court asked if he wished to take a brief recess; Flores answered: "It's okay, sir. It is not the matter – this matter part of selling phones is a difficult thing risking your life."

**B. Discussion**

When reviewing a claim for substantial evidence, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578). " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) "[I]t is the jury, not the reviewing court, that resolves conflicts in the evidence . . . .'Resolution of . . . inconsistencies in the testimony is the exclusive province of the trier of fact.' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 818.)

16

Under section 211, robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." "To establish a robbery was committed by means of fear, the prosecution 'must present evidence ". . . that the victim was in fact afraid, and that such fear allowed the crime to be accomplished." ' [Citations.]" (*People v. Morehead* (2011) 191 Cal.App.4th 765, 772.)

" 'The element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his property.' [Citations.] It is not necessary that there be direct proof of fear; fear may be inferred from the circumstances in which the property is taken. [Citation.] [¶] If there is evidence from which fear may be inferred, the victim need not explicitly testify that he or she was afraid. [Citations.] Moreover, the jury may infer fear ' "from the circumstances despite even superficially contrary testimony of the victim." ' [Citations.] [¶] The requisite fear need not be the result of an express threat or the use of a weapon. [Citations.] Resistance by the victim is not a required element of robbery [citation], and the victim's fear need not be extreme to constitute robbery [citation]. All that is necessary is that the record show ' " 'conduct, words, or circumstances reasonably calculated to produce fear. . . .' " ' [Citation.] [¶] Intimidation of the victim equates with fear. [Citation.] An unlawful demand can convey an implied threat of harm for failure to comply, thus supporting an inference of the requisite fear." (*People v. Morehead, supra,* 191 Cal.App.4th at pp. 774-775.)

In this case, there was sufficient evidence that Flores was afraid and his fear allowed the crime to be accomplished, despite Flores's "superficially contrary" testimony. Flores testified that he was "hesitant" and "a little bit scared." He admitted that when he saw Seals had a knife, he stopped and kept his distance. He thought about Seals using the knife. Seals's act of displaying the knife and later, throwing rocks, deterred Flores and kept him from getting closer to demand or retake the phone. Further, it was for the jury to resolve any conflicts in the evidence. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139.) The jury could reasonably infer from Flores's testimony and conduct during the incident that he was in fact afraid and intimidated. Certainly, Seals's conduct and words were reasonably calculated to produce fear so that he could escape with the phone.

Moreover, the evidence supported an independent finding that Seals used force to accomplish the taking of the phone. Seals not only brandished a knife to dissuade Flores from approaching and retaking the phone, he also threw rocks at Flores to keep him away. "In terms of the amount of force required to elevate a taking to a robbery, 'something more is required than just that quantum of force which is necessary to accomplish the mere seizing of the property.' [Citation.] But the force need not be great: ' " '[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance. . . .' " ' [Citation.]" (*People v. Lopez* (2017) 8 Cal.App.5th 1230, 1235.) Under the circumstances of this case, the jury could reasonably conclude Seals used either fear *or* force to accomplish the taking. (*People v. Wright* (1996) 52 Cal.App.4th 203, 210-211.)

Substantial evidence supported the conviction for robbery.

III.  **The Trial Court Did Not Abuse its Discretion in Denying Seals's *Romero* Motion.**

The People alleged Seals suffered five prior strike convictions: a 1984 conviction for robbery (§ 211); 1990 convictions for robbery, first degree burglary (§ 459), and voluntary manslaughter (§ 192, subd. (a)); and a 1991 conviction for robbery.  The court found true the allegation as to the 1990 and 1991 convictions.  Seals filed a *Romero* motion, asking the trial court to dismiss the strike priors for purposes of sentencing. The trial court denied the motion.  Seals contends the trial court abused its discretion.  We find no error.

A trial court has the discretion to vacate a finding that the defendant suffered prior strikes, pursuant to section 1385, when in light of the nature and circumstances of the defendant's current crime and prior serious and/or violent felony convictions, and "the particulars of his background, character, and prospects, the defendant may be deemed outside the" spirit of the Three Strikes law.  (*People v. Williams* (1998) 17 Cal.4th 148, 161.) When these factors " 'manifestly support the striking of a prior conviction and no reasonable minds could differ[,] the failure to strike would constitute an abuse of discretion.' [Citation.]" (*People v. Solis* (2015) 232 Cal.App.4th 1108, 1124, quoting *People v. Carmony* (2004) 33 Cal.4th 367, 376–378.)

There was no such abuse of discretion here.  Although Seals argues he intended only to commit a non-violent, opportunistic theft, the fact remains that he brought a knife with him and displayed it in furtherance of his crime.  Moreover, as the trial court explained, Seals has a long criminal history that includes numerous serious and violent offenses.  The court noted Seals's adult criminal history began with a 1985 felony drug

violation, and continued with a grand theft conviction in 1987, voluntary manslaughter and robbery convictions in 1990, a robbery conviction in 1991 for which he received an over 10-year prison sentence, and felony violations for illegal taking of a vehicle in 2005 and 2006.

In light of Seals's history and the circumstances of the current offense, the trial court could reasonably conclude Seals is " 'an exemplar of the "revolving door" career criminal to whom the Three Strikes law is addressed.' [Citation.]" (*People v. Carmony, supra,* 33 Cal.4th at p. 379.) The court's denial of the motion to strike Seals's priors was neither irrational nor arbitrary and was not an abuse of discretion. (*Ibid*; *Solis, supra,* 232 Cal.App.4th at pp. 1124-1125.)

## IV. Seals's Sentence of 25 Years to Life is not Cruel and Unusual Punishment.

We further reject Seals's contention that the sentence of 25 years to life on the robbery count violates the Eighth Amendment's prohibition against cruel and unusual punishment. Seals asserts his sentence was grossly disproportionate to his crime of "taking a cell phone, where no one was injured and the phone was recovered at the scene . . . ." This is not an accurate description of Seals's crime or the basis for the sentence. Seals did not merely take a cell phone; the jury found him guilty of robbery, a finding supported by the evidence of Seals's conduct during the commission of the crime. Further, his sentence was the result of his prior strikes, which reflected his long, serious criminal record. (*Ewing v. California* (2003) 538 U.S. 11, 28-31.) "When examining whether the length of a sentence violates the Eighth Amendment, a court may only apply a ' "narrow

20

proportionality" ' analysis.  [Citation.]  We do not find [Seals's] sentence to be so disproportionate to his crime and his life's criminal history that it violates constitutionally prescribed sentencing limits." (*Solis, supra,* 232 Cal.App.4th at p. 1125.)

## V.      Correction of Conduct Credits

The People argue the trial court incorrectly granted Seals conduct credits for 100 percent of his presentence custody time, rather than 15 percent.  Seals did not respond to the People's argument in his reply brief.  We agree the judgment must be modified. (*People v. Fitzgerald* (1997) 59 Cal.App.4th 932, 935 [excessive award of presentence conduct credit may be corrected for the first time on appeal].)

Under section 2933.1, defendants who have committed violent felonies enumerated under section 667.5, and who are sentenced to state prison, are limited to presentence conduct credits of only 15 percent of the actual time served.  Any robbery is a violent felony under section 667.5, subdivision (c)(9).  Thus, Seals was entitled to conduct credits of only 15 percent of his presentence custody time (15 percent of 599). (*People v. Duran* (1998) 67 Cal.App.4th 267, 269-270.)  The judgment must be modified to reduce the amount of presentence conduct credit to 89 days.

21

## DISPOSITION

The judgment is modified to reflect an award of 89 days of presentence conduct credit.  The trial court is directed to prepare a corrected abstract of judgment reflecting the correct award of presentence conduct credit and to forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                SORTINO, J.*

We concur:



        FLIER, Acting P.J.



        GRIMES, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.