Filed 1/25/21  P. v. White CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD EDWARD WHITE,<br><br>    Defendant and Appellant. | G058564<br><br>(Super. Ct. No. 16HF0485)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Richard Edward White and a codefendant stole several bottles of high-end alcohol from two grocery stores in December 2015. Defendant was convicted of burglary and grand theft. He challenges his convictions on several grounds, none of which has merit. We therefore affirm.

First, defendant contends there was not substantial evidence that the fair market value of the stolen alcohol was in excess of $950. Defendant makes a related argument that the jury was not properly instructed as to how to determine the value of the stolen alcohol. There was ample evidence that the value of the stolen alcohol was sufficient to meet the $950 threshold for grand theft, and the jury instructions were correct.

Next, defendant argues the trial court erred by allowing the arresting officer to identify defendant from a surveillance video at one of the grocery stores. The officer had sufficient contact with defendant and the jury was instructed regarding witness identification. In any event, because the jury viewed the surveillance video and could determine for itself whether defendant appeared in it, there was no prejudice.

Finally, defendant argues that the court erred by admitting a witness's statement to the police as a past recollection recorded. We conclude there was no abuse of discretion by the court.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

At about 6:15 p.m. on December 9, 2015, surveillance cameras recorded defendant in the liquor section of an Albertson's grocery store on Quail Hill Parkway in Irvine. Defendant was seen moving three bottles of Veuve champagne and seven bottles of Grey Goose vodka to an endcap shelf display; placing 11 other bottles of champagne in a shopping cart; abandoning that cart in the wine aisle; and leaving the store without purchasing any items. Less than 10 minutes later, Cornetta Hall entered the store, proceeded to the endcap where defendant had placed the bottles of champagne and

vodka, loaded those bottles into a bag, and left the store with them; Hall did not pay for the items in the bag.

About five minutes after Hall left the store, defendant reentered the store and placed nine bottles of Ciroc vodka and eight more bottles of Grey Goose vodka in a shopping cart, which he moved to the wine aisle. Defendant again left the store without purchasing any items. Hall then reentered the store, grabbed a couple of bottles from a shelf display, walked to the wine aisle, and exited the store pushing a shopping cart with items in it. Again, Hall did not pay for the items in the cart.

On December 13, 2015, Ruby Geddes was working as the manager of a different Alberston's grocery store located on Alton Parkway in Irvine when she saw defendant filling a shopping cart with bottles of alcohol. Geddes and another employee, Michael Petriccione, began to follow defendant inside the store. Defendant left the shopping cart in an aisle and exited the store without purchasing anything. Geddes and Petriccione followed defendant outside; defendant yelled at them and walked "aggressively" in their direction.

Officer Giovanni Tapia, who was at the scene on an unrelated matter, contacted defendant, who appeared agitated. Defendant told Tapia he had argued with a white man he believed was staring him down because he was Black. Defendant got into a blue sedan driven by Hall.

Geddes and Petriccione flagged down Tapia and told him about defendant's conduct inside and outside the store. Tapia stopped Hall's car, which had only travelled a short distance. Several bottles of alcohol were found in the car, some of which had security sensors on them; no receipts for any of the alcohol were found. Tapia arrested defendant and Hall.

Tapia watched the December 9 surveillance footage from the Quail Hill store, and identified defendant in the video. Officer Matt Campbell, who had been

3

dispatched to assist with the stop of Hall's car on December 13, also reviewed the surveillance footage and identified Hall in the video.

Defendant was convicted by a jury of second degree burglary (Pen. Code, §§ 459, 460, subd. (b)), grand theft (*id.*, § 487, subd. (a)), and misdemeanor shoplifting (*id.*, § 459.5, subd. (a)).[1]  The trial court found true a prior strike conviction (*id.*, §§ 667, subds. (d) & (e)(1), 1170.12, subds. (b) & (c)(1)), and sentenced defendant to 32 months in prison.  This appeal followed.

DISCUSSION

I.

*VALUE OF THE PROPERTY*

Defendant argues there was not sufficient evidence to prove the value of the alcohol stolen was more than $950, meaning that the convictions for second degree burglary and grand theft must be reversed.

Penal Code section 484, subdivision (a) requires the trier of fact to determine the value of property obtained by theft based on the property's "reasonable and fair market value."[2]  Fair market value "'means the highest price obtainable in the market place. . . . ' [Citation.]  Further, in a retail context, absent proof 'that the price charged by a retail store from which merchandise is stolen does not accurately reflect the value of the merchandise in the retail market, that price is sufficient to establish the value of the merchandise within the meaning of sections 484 and 487.'" (*People v. Seals* (2017)

---

[1]  Hall was also charged in the information; she pled guilty before trial.

[2]  "[S]ection 484 . . . sets the ground rules for how theft crimes are adjudicated—for example, how various terms are defined, how value must be calculated, and how certain evidentiary presumptions operate.  Specific theft crimes are set out in a variety of other sections, and courts have long required section 484's 'reasonable and fair market value' test to be used for theft crimes that contained a value threshold, such as violations of section 487, subdivision (a)." (*People v. Romanowski* (2017) 2 Cal.5th 903, 914.)

4

14 Cal.App.5th 1210, 1216.) Sales tax is a part of the price, and may be considered in determining the fair market value. (*Id.* at p. 1218.)

The following testimony regarding the retail price of the alcohol taken from the Quail Hill store was presented at trial:

Hassan Ayoub, the assistant store director at the Quail Hill store in December 2015, testified Veuve champagne started at $43 per bottle. The least expensive champagne on that store's shelves was $11.99 per bottle, but the champagne on the display from which defendant took the bottles started at $35 per bottle. Grey Goose vodka was priced at $25 to $30 per bottle.

Kin Lau, the center store manager at the Quail Hill store in December 2015, was also familiar with the store's liquor prices. The full retail price of alcohol would be discounted if the customer bought six or more bottles. Lau testified the fair market value of the alcohol was the full retail price; if a customer purchases an item at a discounted price, the manufacturer pays the store the difference.

Lau testified that the lowest priced Veuve champagne in the Quail Hill store was $69.99 per bottle. The retail prices of Ciroc and Grey Goose vodkas were $37.99 and $40.99 per bottle, respectively. Sales tax in Irvine on December 9, 2015 was 8 percent. On December 13, 2015, given all applicable discounts, the prices of the alcohol in question were $44 per bottle for Veuve champagne, $27 for Grey Goose, and $29 for Ciroc.

Based on the testimony of Ayoub and Lau, the fair market value of the alcohol stolen by defendant was $1,675.87, calculated as follows:

| Brand | Number of Bottles | Highest Retail Price per Bottle | Total |
|---|---|---|---|
| VEUVE | 3 | $69.99 | $209.97 |
| GREY GOOSE | 15 | $40.99 | $614.85 |
| CIROC | 9 | $37.99 | $341.91 |
| OTHER CHAMPAGNE | 11 | $35.00 | $385.00 |
| | | Total | $1,551.73 |
| | | Sales Tax (8%) | $124.14 |
| | | Total Fair Market Value | $1,675.87 |

Defendant argues that the prosecutor failed to establish the $950 threshold because the total value taken was calculated based on the retail price, not the Christmas special price or the volume discount price. First, the evidence was that it was the manufacturer and not the retailer who would absorb discounts to the retail price. Further the law is that fair market value is the *highest price* charged by the retailer, not the *wholesale or replacement cost* (*People v. Cook* (1965) 233 Cal.App.2d 435, 438), or the *cost to any particular person* (*People v. Lizarraga* (1954) 122 Cal.App.2d 436, 438).

In determining that sales tax is part of the fair market value of stolen goods, the *People v. Seals* court held: "Determining the fair market value of an item involves a hypothetical transaction between an informed buyer and seller—not the details of any actual particular sale. [Citation.] So long as there is evidence that, in that hypothetical transaction, the ultimate price the willing and informed seller and buyer agree upon would include sales tax reimbursement, that ultimate price is the fair market value. That the item stolen was not purchased, so that sales tax did not actually come into play, does not change the fair market value determination." (*People v. Seals, supra*, 14 Cal.App.5th at p. 1220.) Using this analysis, we conclude that volume discounts and other sales offerings do not change the fair market value of the stolen alcohol.

Defendant also argues that the value of the 11 bottles of non-Veuve champagne was overstated because Lau had testified that Andre champagne was $3 per bottle. This argument fails for two reasons. First, Ayoub testified the least expensive champagne on the store shelves was $11.99 per bottle, but the champagne on the display from which defendant took the bottles started at $35 per bottle. He did not remember whether the Quail Hill store sold lower-end champagne such as Andre. Second, as noted in the chart above, even if the 11 bottles of non-Veuve champagne were removed from the total, the fair market value of the Veuve champagne and the vodka was more than the statutory minimum.

Defendant relies on a newly decided case from Division One of this district, *People v. Grant* (2020) 57 Cal.App.5th 323, 332, in which the defendant's conviction for burglary was reversed, and his conviction for grand theft was reduced to misdemeanor petty theft. The defendant stole a Cole Haan jacket, seven pairs of store-brand gloves, four Karl Lagerfeld backpacks, and two Karl Lagerfeld crossbody purses from an outlet store. (*Id.* at p. 326.) Everything in the store was discounted, and nothing was sold at full value. (*Ibid.*) All of the items stolen had a tag with a "comparable value," to which varying percentage discounts were applied; the tags on the items did not display retail sales prices. (*Id.* at p. 327.)

The appellate court concluded that the jury's finding that the defendant stole items valued at more than $950 "[was] not supported by substantial evidence because the prosecution relied on the 'comparable value' [the store] displayed on the tag attached to each stolen item without introducing any evidence to establish that the comparable values reflect the stolen merchandise's actual fair market values." (*People v. Grant, supra*, 57 Cal.App.5th p. 327.) *People v. Grant* is easily distinguishable from the present case, because there was ample evidence here of the actual fair market value of the stolen alcohol. Indeed, the case undercuts defendant's arguments regarding volume and

7

holiday discount prices to the extent it holds, "[t]his is not to say the jury was required to use [the retailer]'s discounted sales prices." (*Id.* at p. 332.)

## II.

*JURY INSTRUCTIONS*

Defendant argues the trial court committed prejudicial error by giving the jury incomplete, inapplicable, and misleading instructions on how to determine the value of the stolen goods.

The trial court instructed the jury with CALCRIM Nos. 1700 and 1801, describing the elements of burglary and grand theft, and defining "fair market value" as "the highest price the property would reasonably have been sold for in the open market at the time of, and in the general location of, the theft." The trial court also instructed the jury with CALCRIM No. 1860, regarding opinion testimony of the value of the stolen goods: "A witness gave his opinion of the value of the property he owned. In considering the opinion, you may but are not required to accept it as true or correct. Consider the reasons the witness gave for any opinion, the facts or information on which he relied in forming that opinion, and whether the information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable or unreasonable. You may give the opinion whatever weight, if any, you believe it deserves." (CALCRIM No. 1860.)

The Attorney General argues initially that defendant forfeited this issue by failing to raise it in the trial court. "'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal [citations].'" (*People v. Jackson* (2016) 1 Cal.5th 269, 336.) Defendant does not dispute that he failed to object to these instructions or that they contain a correct statement of law. Rather, defendant argues that he may nevertheless raise the issue on appeal because he has been deprived of "a fundamental, constitutional

8

right." Defendant does not cite any cases involving an allegedly misleading jury instruction that was analyzed as having violated of a constitutional right. We conclude that the issue has been forfeited for appeal. We will nevertheless consider the merits of the issue to forestall a claim of ineffective assistance of counsel.

CALCRIM No. 1860 correctly states the rule as to how the jury was to weigh the witnesses' opinions of the value of property. Defendant argues that because two sets of prices were presented at trial (the retail price versus the discounted price) the instruction was misleading for failing to tell the jury which set of prices to consider. To the contrary, the jury instructions fully explained the concept of fair market value, and advised the jury it was to determine the value of the stolen goods. Defendant's contention that the trial court should have instructed the jury which value to give to the stolen goods would have removed the issue from the jury's purview and would have been an error of law.

Moreover, defendant cannot show prejudice. Defendant contends that the alleged error requires reversal per se because the trial court allegedly failed to instruct the jury on a required element of the crime—that the value of the goods stolen must be in excess of $950. As the Attorney General notes, this is patently wrong. The jury was instructed on all elements of the crimes charged, including the minimum value of the goods stolen to convict defendant of burglary and grand theft.

The correct standard for considering prejudice when a jury has been improperly instructed is to determine whether it is reasonably probable the jury would have returned a verdict more favorable to the defendant in the absence of the error. (*People v. Molano* (2019) 7 Cal.5th 620, 671; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The following table shows that, even if the jury had applied a 10 percent volume discount, the total is still far in excess of the $950 requirement:

9

| Brand | Number of Bottles | Regular Price per Bottle | Volume Price per Bottle (10% discount) | Total |
|---|---|---|---|---|
| VEUVE | 3 | $69.99 | $62.99 | $188.97 |
| GREY GOOSE | 15 | $40.99 | $36.89 | $553.35 |
| CIROC | 9 | $37.99 | $34.19 | $307.71 |
| OTHER CHAMPAGNE | 11 | $35.00 | $31.50 | $346.50 |
| | | | Total | $1,396.53 |
| | | | Sales Tax (8%) | $111.72 |
| | | | Total Fair Market Value | $1,508.25 |

Even with the additional holiday discount that Lau testified might have been in place on the day of the theft, the total would still be over the $950 statutory minimum:

| Brand | Number of Bottles | Regular Price per Bottle | Holiday Discount Price per Bottle | Total |
|---|---|---|---|---|
| VEUVE | 3 | $69.99 | $44.00 | $132.00 |
| GREY GOOSE | 15 | $40.99 | $27.00 | $405.00 |
| CIROC | 9 | $37.99 | $29.00 | $261.00 |
| OTHER CHAMPAGNE | 11 | $35.00 | $12.95[3] | $142.45 |
| | | | Total | $940.45 |
| | | | Sales Tax (8%) | $75.24 |
| | | | Total Fair Market Value | $1,015.69 |

---

[3] There was no testimony regarding the holiday discount on the non-Veuve bottles of champagne. The largest holiday discount percentage was 37 percent on Veuve champagne. $12.95 per bottle reflects the application of a 37 percent discount on the non-Veuve champagne.

Defendant cannot show any prejudice from the allegedly improper jury instructions.

## III.

### *IDENTIFICATION OF DEFENDANT*

Defendant claims the trial court erred by allowing Tapia to identify defendant as the person seen in the Quail Hill store's surveillance video. We review the trial court's ruling for abuse of discretion. (*People v. Peterson* (2020) 10 Cal.5th 409, 447; *People v. Leon* (2015) 61 Cal.4th 569, 600.)

Tapia interacted directly with defendant on December 13, 2015, both in the parking lot in front of the Alton Parkway store and then when he stopped Hall's car, in which defendant was a passenger, and arrested defendant. During the stop, Tapia interacted with defendant for about 20 minutes. After another officer transferred defendant to the police station, Tapia again briefly interacted with him when defendant invoked his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. Tapia reviewed the surveillance video about two hours after contacting defendant at the police station. At trial, Tapia testified that he observed defendant in the surveillance video. Tapia was trained in recognizing and obtaining descriptions of people.

A police officer's identification of a suspect may be based on "'contacts with defendant, their awareness of his physical characteristics on the day of the robbery, and their perception of the film taken of the events.'" (*People v. Leon, supra*, 61 Cal.4th at p. 601.) The extent of Tapia's contact with defendant and his familiarity with defendant's appearance went to the weight, and not the admissibility, of his opinion. (*Ibid.*)

The trial court instructed the jury both as to evaluating identification testimony and opinion testimony. (CALCRIM Nos. 315, 333.) The trial court did not err by allowing Tapia to identify defendant in the surveillance video.

11

In any event, there could be no prejudice because the jury viewed the surveillance video and was able to make its own determination of the identity of the person seen in it.  "[B]ecause the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant."  (*People v. Leon, supra*, 61 Cal.4th at p. 601.)

IV.

*WITNESS STATEMENTS THROUGH POLICE OFFICER*

Defendant argues the trial court erred by admitting Geddes's statement to the police as a past recollection recorded under Evidence Code section 1237.  The trial court's discretion to admit evidence under this statute is broad, and "will not be disturbed absent a showing that it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Royal* (2019) 43 Cal.App.5th 121, 144.)

Evidence Code section 1237, subdivision (a) provides:  "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:  [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement."  The issue here is whether the witness testified the statement was a true statement.

Geddes testified she had been working at the Alton Parkway store in December 2015.  Although Geddes believed she was working on December 13, 2015, she

12

did not remember a theft incident occurring that day. Geddes dealt with theft issues several times a week, and spoke with the police regarding theft incidents on several occasions. Geddes testified reviewing a police report did not refresh her recollection of the events on December 13. Geddes had dealt with hundreds or even thousands of theft incidents in the four years since December 2015. When she spoke with the police regarding a theft incident, she was always truthful. If she had given a statement to the police on December 13, 2015, it would have been truthful, and if she made an identification of a person to the police it would have been truthful and based on her personal observation or interaction with that person.

Contrary to defendant's claim in his appellate briefs, Geddes did not testify she is "generally" honest when speaking to the police. Specifically, Geddes testified as follows:

"Q. Now, when you speak to police regarding theft incident, are you being truthful when you say that?

"A. Yes.

"Q. Any statement that you would give to an officer, would you say, was truthful at the time?

"A. Yes. [¶] . . . [¶]

"Q. So if you spoke to an officer on December 13th, 2015, that would have been true at the time?

"A. Yes. [¶] . . . [¶]

"Q. Have you identified people before to officers?

"A. Yes.

"Q. And when you make identifications, are you truthful at those times?

"A. Yes."

13

Tapia testified that he spoke with Geddes on December 13, 2015, and prepared a report containing the statements she made to him. Tapia read Geddes's statements from the report into the record.

Defendant contends Geddes's statement to Tapia contained in the police report was hearsay and should not have been admitted under the past recollection recorded exception: "Geddes testified that when she gives statements to the police they are generally honest. However, [defendant] submits that is not enough to satisfy the statute and the holding in *People v. Simmons* [(1981) 123 Cal.App.3d 677]. She must point to each specific statement in question in the present matter and testify that it was a true statement of any fact in question that is specified in the statement. She must attest to the accuracy of all matters contained in the statement summary penned by Tapia, not just that she generally tells police officers the truth. She could not and did not do so. The hearsay exception advanced here thus fails."

In *People v. Simmons, supra*, 123 Cal.App.3d at pages 682 to 683, the facts were different than in the present case: "[T]he witness does not recall any event recorded in his prior statement, nor even making it or any circumstance surrounding its preparation. At best he can identify his signature affixed to the bottom of the transcription. Therefore, when he states that to the best of his knowledge he had no reason to lie when the statement was prepared, it is clear he could have stated with equal conviction to the best of his (nonexistent) knowledge he had had ample reason to lie. The fact is, he simply has no knowledge at all. One who has no knowledge as to the truth or falsity of a representation may honestly say it is either true or false to the best of his knowledge with neither rejoinder having any evidentiary value."

In *People v. Simmons, supra*, 123 Cal.App.3d at page 679, the witness, after making a written, signed statement to the police, received a serious head injury, causing retrograde amnesia. The court noted that Evidence Code section 1237 was intended to "recognize[] that time universally erodes human memory, although to a

14

greater or lesser degree depending on circumstances and individual characteristics. The motive behind section 1237 is to allow previously recorded statements into evidence where the trustworthiness of the contents of those statements is attested to by the maker, subject to the test of cross-examination, a procedure not meaningfully available here." (*People v. Simmons, supra*, 123 Cal.App.3d at p. 682.) Here, Geddes *did attest* to the trustworthiness of the statements she made to the police officer, and was available for cross-examination. Contrary to defendant's argument on appeal, neither the statute nor the case law interpreting it requires that Geddes testify to the truthfulness of each and every specific statement within the officer's report.

*People v. Cummings* (1993) 4 Cal.4th 1233, disapproved on another ground in *People v. Merritt* (2017) 2 Cal.5th 819, 831, distinguished *People v. Simmons*. In *People v. Cummings, supra*, 4 Cal.4th at page 1292, soon after the defendant told a police informant that he and a codefendant had discussed killing a police officer, the informant provided a statement to a detective. At trial, the informant testified he had no recall of his conversations with the defendant and codefendant, had been undergoing detoxification, was sometimes delusional, and was having drug-related problems, but that his statement to the police detective was truthful. (*Id.* at pp. 1292-1293.) The appellate court held that the trial court did not err in admitting the statement because the trial judge "heard the testimony and had the best opportunity to assess the credibility of the witness. Her conclusion that [the informant] testified truthfully and reliably when he said that his statement to [the detective] was true is supported by the record." (*Id.* at p. 1294.)

Similarly, in *People v. Cowan* (2010) 50 Cal.4th 401, 466, the court held a witness's statement that he told the police officer the truth to the best of his ability did not affect the admissibility of the witness's prior statement contained in the officer's report under Evidence Code section 1237.

Geddes's testimony that she would have been truthful in her statement to Tapia was sufficient under Evidence Code section 1237.

DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.